UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DMITRI GABRYSZAK & JULIE CARLOCK, on behalf of themselves and all other similarly situated, | ) ) ) ) | No. 17 CV 2224 |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Magistrate Judge Young B. Kim |
| AURORA BULL DOG CO., | ) ) ) | December 4, 2019 |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER

Dmitri Gabryszak and Julie Carlock have sued Aurora Bull Dog Company under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, and the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1, *et seq.*, alleging that they and other similarly situated individuals were underpaid during their time working as servers at the Bulldog Ale House, a restaurant owned and operated by Defendant. According to Plaintiffs, managers at the Bulldog Ale House shaved time from their time sheets to avoid paying them for the hours they worked and to skirt Defendant's obligations to pay minimum and overtime wages. They also allege that Defendant failed to provide them with adequate notice of its intent to take a tip credit against their wages, in violation of federal law.[1] Before the court is Plaintiffs' motion for summary judgment and for an adverse inference for the destruction of

---

[1] On October 17, 2017, the court conditionally certified a collective action under the FLSA. (R. 22.) A number of current and former employees of Aurora Bull Dog filed consents to join the collective action. Plaintiffs have not yet moved to certify a class under the IMWL.

data. (R. 102.) For the following reasons, the motion is granted in part and denied in part:

## Background

As an initial matter, the court notes that its task in discerning which facts in this case are material and undisputed has been made difficult by both parties' failure to adhere strictly to the standards set out in Local Rule 56.1. As described in significant detail in *Malec v. Sanford*, 191 F.R.D. 581 (N.D. Ill. 2000)—a case Plaintiffs cite in their reply brief—compliance with Local Rule 56.1 is crucial at the summary judgment phase. That is because "[f]actual allegations not properly supported by citation to the record are nullities," and failing to properly respond to an opponent's supported fact statements can result in those facts being deemed admitted. *Id.* at 583-84.

Here the parties' respective fact submissions fall short of Local Rule 56.1's standards in several respects. For example, in their statement of undisputed facts Plaintiffs include a number of paragraphs making legal assertions or referencing what they "allege," citing nothing but their complaint. It is inappropriate to include legal conclusions in a Rule 56 fact statement, *see Malec*, 191 F.R.D. at 583, and at the summary judgment stage the plaintiff is required to point to evidence, not rely on the allegations in a complaint, *see Estate of Perry v. Wenzel*, 872 F.3d 439, 461 (7th Cir. 2017). Accordingly, the court disregards the statements set forth in paragraphs 1-2, 5, and 10-12 of Plaintiffs' Rule 56.1 statement of facts.

Next, to support statements asserting that Defendant changed time records and lost data, Plaintiffs rely on attorney emails that do not directly or specifically support their assertions and cite to long exhibits (e.g., Exhibit 5 is 193 pages long) without signaling which pages of those exhibits support the factual assertion for which they are cited. (R. 124, Pls.' Facts ¶¶ 15-16.) The party presenting undisputed facts must include specific references to supportive evidence, meaning they must "include page (or paragraph) numbers, as opposed to simply citing an entire deposition, affidavit, or other exhibit document." *Malec*, 191 F.R.D. at 583. The lack of specific citations makes it impossible for the court to confirm the accuracy of the statements set out in paragraphs 15 and 16 of Plaintiffs' fact statement, so the court must disregard them.

Plaintiffs' most significant lapse in the treatment of the facts here results from what appears to have been an oversight. In their reply brief Plaintiffs assert that the court should not consider any reference to Defendant's Counterstatement of Undisputed Facts ("CSF") because, they say, Defendant never filed such a document. (R. 119, Pls.' Reply at 2 n.1.) But Defendant filed its CSF along with its summary judgment response. (See R. 114.) The sanction for failing to reply to the non-movant's statement of additional facts "is identical to that imposed for failing to respond: admission of the opposing party's factual contentions." *Malec*, 191 F.R.D. 584. Accordingly, the court deems admitted the facts submitted in Defendant's CSF, to the extent they are properly supported by specific citations to evidence.

Defendant's factual submissions are similarly problematic in several respects. For example, Defendant twice denies Plaintiffs' facts based on an assertion that the fact is not material without providing any explanation, and in one response denies an assertion about document shredding by citing a paragraph from its CSF that has nothing to do with document shredding. Based on these deficient responses, paragraphs 7, 9, and 17 of Plaintiffs' fact statement are deemed admitted. *See Malec*, 191 F.R.D. at 584 ("If the cited material does not clearly create a genuine dispute over the movant's allegedly undisputed fact, the nonmovant should provide an explanation."). Defendant also "denies" a number of Plaintiffs' fact statements "based on the lack of authentication or identification as required pursuant to . . . Rule 901 of the Federal Rules of Evidence," without explaining those assertions. (See R. 115, Def.'s Resp. to Pls.' Facts ¶¶ 21, 23-28.) According to Plaintiffs, all of the evidence cited in support of these paragraphs are documents that originated with and were produced in discovery by Defendant. It is unclear then why Defendant wants Plaintiff to authenticate documents Defendant produced itself.[2] Accordingly, the fact statements set forth in paragraphs 21 and 23-28 of Plaintiffs' fact statement are deemed admitted.

Turning to those facts that have been properly supported or deemed admitted, the following undisputed facts will be viewed, as they must be at this stage, in the light most favorable to Defendant. *See O'Leary v. Accretive Health,*

---

[2] To the extent paragraph 21 of Plaintiffs' fact statement is drawn from "chit sheets" retained by Opt-In Plaintiff Emily Horn and produced by Plaintiffs as Group Exhibit 7, she submitted an affidavit along with Plaintiffs' reply authenticating that exhibit. (R. 119-1, Pls.' Reply, Ex. 1.)

4

*Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). Defendant operates a restaurant called the Bull Dog Ale House, which is located in New Lenox, Illinois. (R. 115, Def.'s Resp. to Pls.' Facts ¶ 3.) Servers at the Bull Dog Ale House are all paid a wage of $4.95 per hour, plus tips. (Id. ¶ 4.) The servers log their hours by clocking in and out for their shifts using software called "Focus," which runs on Defendant's point of sale ("POS") system. (Id. ¶¶ 6-7.) The POS system is installed on several computers throughout the restaurant. (Id. ¶ 7.) When a server clocks out at the end of a shift, the POS system prints a close-out report which shows, among other information, the hours the server worked, the food and drink totals the server sold, and the credit card tips the server collected. (Id. ¶ 8.) The servers are responsible for entering their cash tips into the Focus system. (R. 114, Def.'s CSF ¶ 10.) Servers are not able to manually change their clock-in and clock-out times in Focus. (R. 115, Def.'s Resp. to Pls.' Facts ¶ 9.)

In addition to the close-out report, the POS system prints a "chit sheet" showing the time the server clocked in and clocked out. (Id. ¶ 19.) Gabryszak saved his chit sheets to support his allegation that Defendant shaved time reported in the Focus system but did not produce them in discovery. (R. 114, Def.'s CSF ¶ 14.) The named Plaintiffs do not remember any specific dates or times that Defendant shaved from their Focus reports. (Id. ¶ 17.) In support of their time-shaving claim, Plaintiffs point to discrepancies between a Focus report generated in 2017, a Focus report generated on February 21, 2019, and chit sheets produced for Opt-In Plaintiff

5

Emily Horn. (R. 115, Def.'s Resp. to Pls.' Facts ¶¶ 20-25.) Those documents reflect the following discrepancies in Horn's time records:

| Dates | Hours Reflected in 2017 Focus Report | Hours Reflected on February 21, 2019 Focus Report | Hours Reflected on Chit Sheets |
|---|---|---|---|
| 10/27/16 | 4:45 p.m.–10:20 p.m. | No Hours | 4:45 p.m.–11:20 p.m. |
| 10/28/16 | 11:58 a.m.–9:18 p.m. | No Hours | 11:58 a.m.–10:03 p.m. |
| 01/10/17 | 4:39 p.m.–10:15 p.m. | 4:39 p.m.–10:15 p.m. | 4:39 p.m.–10:46 p.m. |
| 01/14/17 | 12:02 p.m.–9:35 p.m. | No Hours | 12:02 p.m.– 11:25 p.m. |
| 01/27/17 | 4:45 p.m.–11:54 p.m. | No Hours | 4:39 p.m.–1:30 a.m. |
| 02/04/17 | 11:58 a.m.–10:08 p.m. | No hours | 11:58 a.m.–11:29 p.m. |
| 02/05/17 | 11:29 a.m.–6:10 p.m. | No hours | 11:29 a.m.–7:07 p.m. |

(Id. ¶¶ 21-22, 25.) Defendant also produced a "Voids Report" (also known as a "Time Card Audit Report") reflecting changes to time punches, including seven changes to Horn's hours between August 2016 and January 2017. Two of the dates reflecting changes in Horn's time punches correspond with shifts reflected in the chart above: January 10, 2017, and January 27, 2017. (Id. ¶ 26; R. 104-6, Pls.' Facts Ex. 6 at 16.)

Defendant routinely shreds paper copies of the POS system's close-out reports showing the servers' clock-in and clock-out times about six to eight months after they are generated. Defendant continued with that practice even after this lawsuit was filed in March 2017. (R. 115, Def.'s Resp. to Pls.' Facts ¶ 17.) Defendant admits that on February 17, 2019, there was a data loss involving the Focus close-out reports after the POS system was infected by a computer virus. (Id. ¶¶ 16, 28; R. 113-1, Def.'s Ex. 8, Souza Aff. ¶ 4.)

Defendant uses a third-party accountant to monitor its payroll reports, which are derived from Focus, and to issue paychecks. (R. 114, Def.'s CSF ¶¶ 7-9.) The

6

accountant audits the tip credit to ensure that servers are paid at least minimum wage. (Id. ¶ 9.) The accountant has never had to make payroll adjustments based on a failure for a server to earn minimum wage inclusive of tips. (Id.)

With respect to Plaintiffs' allegations that Defendant failed to provide servers with legally sufficient notice of its intent to take a tip credit, Defendant points out that it hangs posters in the New Lenox Bull Dog Ale House location with information about minimum wage laws. (Id. ¶ 4.) Defendant advises potential servers about the hourly wage rate and the ability to earn tips during the interview process. (Id. ¶ 3.) After a server is hired to work at the New Lenox Bull Dog Ale House, General Manager Edgar Souza is responsible for the new server's training. (R. 115, Def.'s Resp. to Pls.' Facts ¶ 29.) During that training, Souza reads Defendant's Employee Handbook to the new server. (Id. ¶ 30.) The Employee Handbook does not mention the tip credit. (R. 104-9, Pls.' Facts Ex. 9.) Souza also informs new servers that they have to claim all of their tips but are required to participate in a tip pool including bartenders, busboys, and food runners. (R. 114, Def.'s CSF ¶ 5.)

## Analysis

In the current motion Plaintiffs argue that they are entitled to summary judgment on their FLSA and IMWL claims because, according to them, the mismatch between the hours reflected in Horn's Focus reports and those shown on her chit sheets, coupled with the data loss following Defendant's February 2019 computer virus, establish their entitlement to judgment with respect to Defendant's

7

liability. Plaintiffs also argue that Defendant was not entitled to take a tip credit against their wages because, they say, the undisputed facts demonstrate that Defendant failed to comply with the FLSA's tip credit notice requirements. Alternatively, Plaintiffs argue that they are entitled to an order requiring a spoliation instruction at trial along with an adverse inference in their favor based on the evidence that Defendant continued to shred paper documents after this lawsuit was filed and lost relevant data in the wake of a computer virus.

Summary judgment is appropriate if the moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court's function at the summary judgment stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Summary judgment is not appropriate if there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250. In making a summary judgment determination, the court takes the record in the light most favorable to the non-moving party, drawing all reasonable inferences in its favor. *O'Leary*, 557 F.3d at 630.

**A.  Time-Shaving Claims**

Beginning with Plaintiffs' argument that they are entitled to summary judgment with respect to their claims that Defendant violated the FLSA and IMWL

by failing to pay them for all of the time they worked, the court concludes that there remain genuine issues of material fact with respect to whether Defendant changed Plaintiffs' time records. Plaintiffs' time-shaving arguments in their opening brief are so condensed that they are difficult to follow. Plaintiffs assert that they are entitled to summary judgment on the question of liability because Defendant suffered a data loss in February 2019 and, accordingly, it has no means to rebut Plaintiffs' assertions that managers shaved time from their time sheets. (R. 103, Pls.' Mem. at 7.) Plaintiffs do not explain what specific data was lost or how that data could have supported their time-shaving claims. (Id. at 6-7.)

Plaintiffs cite only two cases, *Wirtz v. Turner*, 330 F.2d 11, 13 (7th Cir. 1964), and *Brown v. Family Dollar Stores, LP*, 534 F.3d 593, 594-98 (7th Cir. 2008), to support their argument that the evidence of data corruption means "Defendants are unable to rebut Plaintiffs' assertions that they worked hours for which they were not paid." (R. 103, Pls.' Mem. at 7.) But Plaintiffs' argument gets the rules set forth in those cases backward. *Wirtz* and *Brown* build from the burden-shifting rule established in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946), in which the Court found that where an employee seeking unpaid wages shows "that he has in fact performed work for which he was improperly compensated," and produces enough evidence to show the amount of unpaid time "as a matter of just and reasonable inference," then the burden shifts to the employer to produce evidence of the exact time worked. The Court further explained that if the employer's records are incomplete or inaccurate, that does not preclude the

9

employee's recovery, and a trial court can approximate the damages. *Id.* This rule allows plaintiffs to recover for unpaid time once they establish liability even if the employer's faulty records preclude a precise calculation of damages. Both *Wirtz* and *Brown* recognize that a plaintiff's burden to establish work without proper payment is a precursor to holding the employer's inaccurate time-keeping against it. *See Wirtz*, 330 F.2d at 14 (recognizing that "whether and to what extent claimant worked" without proper pay is a question that precedes whether there "is a basis for reasonable inference as to the extent of damages" (quoting *Anderson*, 328 U.S. at 688)); *Brown*, 534 F.3d at 596 ("The *Anderson* test addresses whether there is a reasonable basis to calculate damages, and assumes that a violation of the FLSA has been shown."). In other words, the cases Plaintiffs cite here do not establish that some amount of data loss requires a finding of liability on their FLSA and IMWL claims.

In their reply Plaintiffs pivot from depending solely on the data loss to support their unpaid hours claim to pointing out the discrepancies in the hours reflected for Horn in the 2017 Focus Report, 2019 Focus report, and chit sheets. (R. 119, Pls.' Reply at 2.) It is not a good strategy for a party to withhold until a reply brief the specifics of an argument on which it seeks summary judgment, because it is well-established that failing to develop an argument until the reply brief can result in the argument's forfeiture. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009). But even if the court were to overlook the potential forfeiture here, Plaintiffs' explanation of their evidence is insufficient to produce a clear

conclusion that Plaintiffs were not paid for hours they worked. They assert that their Exhibit 6, the Voids Report (or Time Card Audit Report), "captured each change made to a server's time," and say that because it was generated after the February 2019 computer virus, it is missing data. (R. 119, Pls.' Reply at 4.) Again, this explanation sheds no light on what specific data is missing and how the missing data impacts Plaintiffs' ability to prove their time-shaving claims. Plaintiffs have not cited any pages in the Voids Report conveying data pertaining to anyone other than Horn. Nor have Plaintiffs explained how the Voids Report shows that Defendant changed Horn's time with respect to the seven dates showing discrepancies. The Voids Report reveals changes made on only two of the relevant seven dates, so its relationship to the other five dates is unclear. The named Plaintiffs testified that they kept print-outs of their chit sheets supporting their underpayment claims, but they have not provided those records in support of their motion. Simply put, Plaintiffs' failure to sufficiently explain the data conveyed in the exhibits they submit undercuts the court's ability to conclude that they are entitled to judgment as a matter of law on their time-shaving claims.

It may be that the records Plaintiffs point to coupled with the data loss in fact support Plaintiffs' position. But at this stage the undisputed facts are insufficient to establish that Plaintiffs' position is the only one a reasonable jury could accept. *See Anderson*, 477 U.S. at 250. Plaintiffs' description of what the various time records mean here is insufficiently developed to allow the court to conclude that the only reasonable explanation for the discrepancies in Horn's records is that

11

Defendant manually altered her clock-out times in the Focus system, let alone that it engaged in a scheme to shave time extending to the named Plaintiffs and all of the Opt-In Plaintiffs. Given the ambiguities in the evidence, what the various time records show with respect to Plaintiffs' time-shaving claims is a question that a fact-finder must resolve. On the current record, there are gaps in the evidence and disputed material facts surrounding the time-shaving claims. Accordingly, Plaintiffs have not shown that they are entitled to summary judgment on the time-shaving aspect of their FLSA and IMWL claims.

**B.     Spoliation/Adverse Inference Instruction**

Turning to Plaintiffs' alternative argument that they are entitled to an adverse inference instruction at trial, the current evidence is insufficient to support the requested instruction. Plaintiffs argue that they are entitled to this instruction both because Souza testified that Defendant did not suspend its practice of shredding paper copies of time records after this litigation was filed, and because it lost some amount of data in the wake of a February 2019 computer virus that infected its POS system. Relying heavily on cases from the Ninth Circuit and Northern District of California, Plaintiffs argue that to justify an adverse inference instruction it is enough for them to show that Defendant "acted with at least a conscious disregard of its obligations to preserve documents." (R. 103, Pls.' Mem. at 14.) But the Seventh Circuit has expressly rejected the Ninth Circuit's "less stringent standards" on spoliation and has made clear that "[s]imply establishing a duty to preserve evidence or even the negligent destruction of evidence does not

automatically entitle a litigant to an adverse inference instruction in this circuit." *Bracey v. Grondin*, 712 F.3d 1012, 1020 (7th Cir. 2013).

Instead, to justify an adverse inference instruction Plaintiffs must establish that Defendant destroyed the missing evidence "in bad faith." *Bracey*, 712 F.3d at 1019. "The crucial element in a spoliation claim is not the fact that the documents were destroyed but that they were destroyed for the purpose of hiding adverse information." *Norman-Nunnery v. Madison Area Tech. Coll.*, 625 F.3d 422, 428 (7th Cir. 2010); *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998) ("That the documents were destroyed *intentionally* no one can doubt, but 'bad faith' means destruction for the purposes of hiding adverse information." (emphasis in original)). Under this standard, the bad faith element requires more than evidence that Defendant destroyed documents as part of a regular business practice. *Odongo v. CEVA Logistics, U.S., Inc.*, 758 Fed. Appx. 554, 556 (7th Cir. 2019); *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008). It also requires evidence above and beyond speculation that the documents or data were destroyed for the purpose of hiding adverse information. *Faas*, 532 F.3d at 645.

Based on the record before the court Plaintiffs fail to show that the data destruction amounted to a bad-faith attempt to conceal evidence adverse to Defendant. To the extent Plaintiffs point to the paper-shredding practice, the fact that Defendant failed to suspend that practice standing alone is not enough to meet the bad-faith standard. *See Odongo*, 758 Fed. Appx. at 556. And as for the computer virus, there is no evidence that this was an event that should have been

13

anticipated, or that Defendant somehow intentionally permitted the loss of data. In their reply Plaintiffs list steps Defendant could have taken to better ensure data security, but they point to no evidence that the virus was connected to any intent on Defendant's part to hide negative information. (R. 119, Pls.' Reply at 6-7.) As such, the request for an adverse inference instruction is denied.

**C. Tip Credit Notification**

Plaintiffs find traction with their argument that they are entitled to summary judgment with respect to their claim that Defendant violated minimum wage laws by paying its servers sub-minimum wage without adequately notifying them of its intent to take the tip credit. Under the FLSA an employer may pay tipped employees less than the minimum wage as long as the cash wage plus the tips received equal or exceed the minimum wage. *See* 29 U.S.C. § 203(m); *see also* 29 C.F.R. § 531.59. However, under federal law the employer may not take this tip credit "unless such employee has been informed by the employer of the provisions" of Section 203(m). *See* 29 U.S.C. § 203(m)(2)(A). Under the corresponding federal regulation, the notice requirement with respect to the tip credit means that the employer must, "in advance of" its use of the tip credit, inform the employee of:

> [t]he amount of the cash wage that is to be paid to the tipped employee by the employer; the additional amount by which the wages of the tipped employee are increased on account of the tip credit claimed by the employer, which amount may not exceed the value of the tips actually received by the employee; that all tips received by the tipped employee must be retained by the employee except for a valid tip pooling arrangement limited to employees who customarily and regularly receive tips; and that the tip credit shall not apply to any employee who has not been informed of these requirements."

14

29 C.F.R. § 531.59(b). Under this framework "workers are entitled to knowledge about the tip-credit program but not to a comprehensive explanation." *Shaefer v. Walker Bros. Enters., Inc.*, 829 F.3d 551, 556 (7th Cir. 2016); *see also Kilgore v. Outback Steakhouse of Fla., Inc.*, 160 F.3d 294, 298 (6th Cir. 1998) (concluding that "an employer must provide notice to the employees, but need not necessarily 'explain' the tip credit"). Nonetheless, "[t]he notice requirement is a firm one." *Reich v. Chez Robert, Inc.*, 28 F.3d 401, 404 (3rd Cir. 1994). The "statutory minimum" information that the employer must convey is that it will pay less than minimum wage in anticipation of the employee earning tips, how much less than the minimum wage the employer will pay, and that the employer will make up any difference between the minimum wage and the cash wage plus tips that the employee earns. *Schaefer*, 829 F.3d at 556-58.

Courts have recognized that although it "is not difficult for the employer" to meet the tip-credit notice requirements, the penalty for failing to meet those obligations can be "harsh." *Martin v. Tango's Restaurant, Inc.*, 969 F.2d 1319, 1323 (1st Cir. 1992). That is because "an employer who violates the provisions of § 203(m) is liable for the full minimum wage for every hour worked by the employees."[3] *Driver v. AppleIllinois, LLC*, 917 F. Supp. 2d 793, 800 (N.D. Ill. 2013). The employer bears the burden at trial to establish that it provided sufficient notice

---

[3] The Third Circuit has concluded that district courts lack discretion to "alleviate the harsh results of the notice requirement by reducing damages out of an equitable sense that some offset for tips should be allowed," noting that, "[i]f such a ruling were permissible, the district courts would effectively have discretion to waive the notice requirement in the interests of perceived fairness to the employer." *Reich*, 28 F.3d at 404.

15

of its intent to take the tip credit. *Perez v. Lorraine Enters., Inc.*, 769 F.3d 23, 27, 30 (1st Cir. 2014); *see also Basina v. Sushi Thai*, 14 CV 4090, 2016 WL 6833921, at *4-*5 (N.D. Ill. Nov. 21, 2016).

Here, Defendant has not pointed to evidence sufficient to show that it conveyed the required information to its servers before taking the tip credit. According to Defendant, it met the FLSA's notice requirements because Souza informed potential servers in their interviews that they would be paid $4.95 per hour plus tips. (R. 114, Def.'s CSF ¶ 3; R. 113, Def.'s Ex. 1, Souza Dep. at 26.) That is enough to show that Defendant notified servers that they would be paid less than minimum wage in anticipation of tip earnings, but there is no evidence showing that Defendant informed its servers how much less $4.95 is than the minimum wage or that it would make up any deficit between a server's cash wage plus tip earnings and the minimum wage. *See Shaefer*, 829 F.3d at 556-57.

To shore up its argument Defendant asserts that it hangs posters in the Bull Dog Ale House notifying servers "of minimum wage laws," and these posters "are changed every year." (R. 114, Def.'s CSF ¶ 4.) But Defendant has not submitted those posters in support of its summary judgment response or provided any specific description of the posters' contents. Nor has Defendant pointed to evidence that these posters are distributed by the Department of Labor to fulfill the notice requirement. Souza simply testified that the posters describe "minimum wage, pregnancy, works—just in case you get into an accident or something like that." (R. 113, Def.'s Ex. 1, Souza Dep. at 77.) Souza said he did not know where the

16

posters came from. (Id. at 78.) Defendant's assertion that the posters provide information about minimum wage laws is insufficient to show that the posters filled in the missing information required under Section 203(m).

Finally, Defendant relies on Souza's testimony that during training sessions he informed servers that they would keep all of their tips but would have to participate in a tip pool. (Id. ¶ 5.) Even taking this evidence at face value and in combination with the other undisputed facts, drawing all reasonable inferences in Defendant's favor, no reasonable jury could conclude that this testimony is sufficient to establish that Defendant informed servers that it would make up the difference between the minimum wage and the actual cash wage plus tips that a server earns. That is statutorily-required information, *see Shaefer*, 829 F.3d at 556-58, and there is nothing in the record to show that Defendant ever conveyed it.

Summary judgment has been described as the "put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (citation and quotation marks omitted). Because Defendant has the ultimate burden of persuasion on the notice issue, once Plaintiffs pointed out the absence of evidence showing Defendant complied with the Section 203(m) notice requirements, to avoid summary judgment Defendant is required to produce evidence that would allow a finder of fact to find in its favor with respect to the Section 203(m) issue. *See Celotex*, 477 U.S. at 322-23; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168-69 (7th Cir. 2013). Defendant has not pointed to any evidence

17

demonstrating that it provided its servers with all of the statutorily required information before taking the tip credit. Accordingly, Plaintiffs are entitled to summary judgment with respect to the tip credit notice aspect of their FLSA claim.

## Conclusion

For the foregoing reasons, Plaintiffs' motion for summary judgment is denied to the extent they seek judgment on their time-shaving claims and an adverse inference instruction but granted to the extent they seek judgment on their tip credit notification claim.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**